Good afternoon, Your Honor, or Your Honors. My name is Toby Cook, and I represent Mr. Wing in this appeal. I'd like to reserve one minute for rebuttal, if I may. You sure can. Just keep track of your own time, please. Go right ahead. Okay, thank you, Your Honor. Your Honor, in this case, the court is being asked to extend a very, very narrow exception under Rule 803, Sub 4, to allow statements of fault to extend not only in child sex assault cases or child sex offense cases, but essentially to any assault case. Now, we believe this would establish a very dangerous precedent and could create a very slippery slope, which would allow a very, very narrow exception to swallow the entire rule. So, Mr. Cook, is this a question about attributing fault, or is it the identity of the individual, or how the person got injured? I think in the comment, it talks about the fact that you can say, the patient can say, I got struck by a car, but you can't say I got struck by a car that went through a red light. Right. So, here we have the identity in the statement of the individual who the patient is saying is the reason why she received those injuries. Yes, Your Honor, that's a very, very important point. In this case, identity was the sole issue for the jury to decide. The two prior convictions were stipulated to the status of the victim as Mr. Wing's spouse was admitted to. The location of the assault and tribal membership was agreed to, and there was really no challenge or question in front of the jury as to whether or not an the sole issue of fact for the jury to determine was the identity of the perpetrator. Right. So, was that information sufficient for medical diagnosis and treatment? Was it related to that part of it, or was it? No, Your Honor. In fact, Dr. Caholm testified and was asked on cross-examination by trial counsel. He was asked, is it necessary for you to know who did it, or is it enough just to say I was assaulted and I was beaten here, here, and here? And the doctor testified, yeah, that's sufficient. Well, is that true though? Because I'm looking at SCR 172 with regard to his transcript on the cross-examination. And what import do you think, if any, we should put on lines 10 through 15, where the question following what you had mentioned, he says, so sometimes you require more information. He says, yeah, and it's all event-specific. Answer, yeah. Is that right? Yeah. Is that helpful to us, or should we disregard that section of his testimony to determine the issue before us? Well, event-specific, I mean, there may be more information that's event-specific that is necessary for medical treatment or diagnosis, for instance. Well, counsel, I'm focusing, in addition to what Judge Kobayashi focused on, page 166 of the supplemental exerta record, where Dr. Collins said, we have to know kind of background because that tells us magnitude of force, and then we can prognosticate how bad the injury could be or the possibilities of internal injuries. And Dr. Cajon is seeing her almost right afterwards. And so knowing who did it, are they going to be back with that person? How big is that person? I mean, it seems to me that he laid a foundation for 8034 for his testimony. Why isn't what I just quoted enough? Well, because then he doesn't relate any specific amount of force to any specific injury. He doesn't say, well, you know, this force or this injury could be caused by anybody, or this injury could only be caused by somebody who is of a certain or able to use a certain amount of force. Well, but the rule talks about reasonably pertinent. And the rule also talks about you can describe the general cause of injuries. So for somebody who's just showed up to the ER with the kind of injuries the complainant here had, it strikes me that what he said is enough. I have some real problems with Dr. Guzman days later, but for Dr. Cajon, it seems like it sort of fits right in the rule and that the rule shouldn't be limited to sexual assault cases in a case like this where the treatment is right after. I mean, what public policy behind the rule does it serve to exclude this kind of testimony? Well, and your honor, I think the problem is Marlena, or at least neither of the doctors testified that the victim identified the spouse and another perpetrator. She only identified the spouse, but the record at trial is very clear. Marlena admitted that she delivered the blows. And now she equivocated on that after. It's very clear that she didn't take responsibility for all of them by any means. Yes, she also testified that your client delivered some of the blows. I mean, she also had told, had stated that your client delivered some of also, right? She did on cross-examination. That's correct, your honor. And that's essentially the crux of this. She testified one way and then she kind of equivocated and testified that my client delivered some of the blows on a second attack, which was never mentioned to either of the was mentioned to either of the doctors. Oh, I'm sorry. No, no, please stretch. Doesn't that go to credibility of the witnesses? It doesn't go to the heart of what this evidentiary rule provides, which is that it's made for and reasonably pertinent to medical diagnosis of treatment and part of the general causes. I mean, that part is, you know, I skipped over a part of that because that doesn't apply here. So whether or not she was completely truthful is what your argument is. That goes to credibility. But the real issue is for Dr. Cajon, for him to be able to testify what the patient told him, it has to be to assist him in making a diagnosis. Correct. Correct. And I would agree with that, your honor. In this case, he really didn't say other than saying the amount of force and things like that, but he didn't correlate how that helped him in his diagnosis of the victim in this case. Counselor, I'd like to ask a different question. I'm trying to figure out whether this is adequately preserved. There's a pretrial discussion and ruling. I'm trying to figure out why your position is that it was sufficiently definitive when the trial court judge invited objection at trial. And then when the objection came in Dr. Cajon's case, it was an objection on the basis of foundation. Correct. I believe that's, yes, I believe that's correct, your honor. I would argue that it was sufficiently preserved because of the pretrial conference. And then it was objected to again, right before Dr. Cajon's. Right. I'm aware of the sequence and I don't think I asked a very good question, but this is why I'm not quite so sure that it's, that I agree with you. And the problem I have is that the judge ruled, he said sort of generally, this is generally going to come in. And then he said, you may object if you want, as we've just discussed. And the reason that it strikes me as a little less than definitive is that it wasn't entirely clear, I don't think, at the pretrial conference, uh, what the theory was going to be to get the evidence admitted. Right. And so, so whenever you're looking at an objection, we're talking about what is the evidence offered to prove, you know, for what purposes is it offered? And this kind of evidence can come in and we've all seen it come in several different ways, but until the trial court really knows what the prosecutor is going to do to try to get it in and exactly what the objection is, it's, it's, it's fuzzy at best, isn't it, pretrial? I, I, I would respectfully disagree with that, your honor. I think they, uh, it, they specifically mentioned rule 803 sub four and talked about how the comments advised against, uh, statements of fault. So, uh, I would argue in the pretrial conference, they did, they did discuss that. In fact, uh, trial counsel, they did, they did proffer, you know, sort of one way to get it in. But my point is that at trial, there are, there are other evidentiary rules that could have been employed here. And so that's why I'm wondering if the judge's ruling can really fairly be characterized as definitive. I'm taking you, um, you're in danger of going over your time. I'll put a little more, um, on the, on the rebuttal clock for you, but is there anything more you want to say on this point before we turn it over to the prosecutor? Uh, I, I don't believe so, your honor. Judge Christin. Yeah, I apologize, but, um, I'm not sure this was dealt with in the briefs on, on harmless error, but, but I had one point I wanted you to address and maybe it is in the briefs and I missed it. And this is with regard to officer Helgeson's testimony. Um, so defense counsel wanted officer Helgeson to read part of his report into the record. And, um, before that was done, the prosecutor said, well, you know, rule of completeness, I'm going to want something else on cross. And, and the, your client's counsel went ahead and read the part knowing that more would come in. And then I'm looking at SCR 237 and, uh, the prosecutor is asking defense count is asking officer Helgeson to read the rest regarding the victim and what the victim had told him. She said that Jeremy was intoxicated and began to assault her. She said that Marlana has the Eagle muggy was helping Jeremy beat her up. She said that was all that had happened. So, um, the defense counsel opened the door to having sort of the, the victim's statements at the time come in through officer Helgeson. So why doesn't that render, um, anything that went on with the doctors, even if we were to find it error harmless? Uh, well, your honor, um, I would, I would argue that it's, it's, uh, not harmless because the, the, um, I believe the statement taken by officer, uh, Helgeson was sometime later, uh, if I'm remembering that correctly. No, I don't, I don't, I don't think you, well, I, I, I, I'm not sure that is correct, but even if it wasn't like immediately after it was real close and it's, uh, uh, it's like this, the same thing except actually in more detail. Right. Your honor. And, and I believe that, you know, that could have impacted the jury. Um, we really, we really don't know what they were exactly what they were hung up on for five and a half hours before they sent the judge a letter saying that they were, or a note saying that they were deadlocked. Uh, but because the only question in this case is identity of the perpetrator, uh, they had to, they had to hang their hat on something. Now, if, if it wasn't, if it wasn't necessary for the doctors to testify as to statements of fault, uh, then, then there would be no reason to introduce that, introduce that evidence or that testimony. Um, if it was going to, I mean, if, if another, another witness was going to testify to that. Counselor Yerrick, significantly over your time, could you please, um, wrap up your answer to Judge Bennett's question so we can hear from the government? Yes, your honor. Um, so, so I, I would just argue that, uh, it was, it was duplicative and, uh, the doctors had significant credibility due to their credentials and, and, uh, particularly Dr. Caholm's, uh, examination shortly after the event itself. Thank you. We'll hear from the government, please. May it please the court, Kayla Paisley, um, from the Great Falls office of the U.S. attorney for the district of Montana on behalf of the United States. The district court did not abuse its statements, um, from the victim regarding how she incurred the injuries, uh, at trial. It was, uh, in domestic violence, as this court is aware, as the Supreme Court has written in Bryant, domestic violence is extremely prevalent in Indian country. These doctors practice exclusively, well, not exclusively, but mostly in Indian country and in Indian country. Counsel, we're really familiar with the record and, and, and, and exquisitely sensitive to the policy arguments that you're going to make and that you have made. Um, but what about Dr. Guzman's testimony? So Dr. Guzman's testimony raises an interesting question and that, that was whether or not if anything's preserved for the record, that was never, uh, raised in a motion by defense, um, pretrial and was not objected to at trial. So if anything is not, um, uh, addressed as far as, not being preserved, that, uh, I think that, uh, is, um, that one, that one is probably the one that's not preserved, but as far as the practical implications and how, why the court did not use its discretion in allowing both of those statements to come in is the recognition of the circumstances that are similar in child abuse cases and domestic violence, because that's the reason. Before you go there, are you conceding that the other objection to Dr. Cahill was adequately preserved? Is that the government's position? Not conceding it, but recognizing that the Guzman one is certainly not preserved. All right. And so, uh, and I did not brief, uh, the preservation issue. So the, with regard to both of these statements, whether or not an inquiry at a pertinent, reasonably pertinent to diagnosis can change depending on the nature of the assault. And the same circumstances that are present in this court's case law regarding child sex abuse, as far as the emotional trauma and psychological trauma are substantially similar to those present in domestic assault cases. But counsel, with regard to, uh, Dr. Guzman, this was two days afterwards, right? Correct. And Dr. Guzman, if I'm remembering correctly, didn't say a word in his testimony, because if I'm remembering correctly, the government didn't ask him about why, who did it two days before would be relevant to any treatment he was providing. Am I remembering that correctly? You are. And if I, if I remember. And, and, and so if, if that's right, even if you were right, um, about Dr. Cajon, um, and putting aside for the minute, um, harmless error, and even if we were to find that something right afterward were okay, why would we find that without a word in the record that it was relevant to Dr. Guzman and two days later, um, why would, why would that be okay under the rule? Well, again, there was no objection to it. So whether or not it, it was properly brought in under 8034, I don't think there was a hearsay objection to that statement, but the pre the pretrial, and I'll let you answer, I apologize, but pretrial, it mentioned doctors, right? Was it, was it Dr. Cajon and another doctor beside Dr. Guzman? So the doctor's statements that were referenced in the pretrial involved Dr. Guzman as well, but Dr. Guzman's statements that the government talked about in pretrial were those statements he made related to injuries Mr. Wing sustained because, and, and the government outlined in pretrial that we would be admitting those or seeking to admit them as the defendant's statements, um, and admissible as statements of Okay. And you were, you were going to answer my question, putting that aside as to why this should have, why this was okay under the rule, the Guzman statement, putting aside the issue of whether it was preserved. Correct. And, and it really comes down to how domestic assaults are addressed at the hospital. When somebody seeks medical intervention at the hospital, it's often one of the only points of intervention. And so routinely the doctors are asking how the situation, can it affect the way that they diagnose the issue and address the injuries? Because there may be previous untreated injuries that are still, that the victim is still suffering from that. And obviously there are social worker aspects of it as well, but for purposes of the medical side, knowing whether or not that person is, and Judge Bennett, you said it yourself, um, during, uh, during the appellant portion that, um, knowing that force and the size of person. And if that person's going to go back and be in that situation, that is all relevant to the medical treatment. Well, it is. And we've certainly seen, hold on, hold on. And we certainly, that's why it matters. The, the reason that evidence is being proffered and we can imagine any, cause we've seen it, um, other circumstances where this kind of evidence comes in. So for example, if the government had argued, well, we needed to know this evidence, this particular witnesses needed to know because this person was being admitted to a shelter and they didn't know to whom they're not going to allow, you know, entrance, for example, you know, that would be, uh, related, but you can imagine a circumstance where then that this type of, uh, evidence would be relevant for that purpose, right? Yes. Right. And so on this record, what did the government, what kind of foundation did you lay here? With regards to... Quite different between Guzman and Dr. Cohn, quite different, right? Correct. And I think in large part, because the government did not expect that answer from Dr. Guzman. That's my memory of how this came out at trial. And obviously you can't read it on there, but the fact that it wasn't raised in pretrial or address was, I don't believe that we anticipated that coming out. And so obviously it did come out and it came out indirect. There wasn't an objection to it at that time, but that's also likely why there wasn't a foundation, but ultimately that statement... It wasn't a concern in this case, was there with either of these physicians? Did either of them testify that there was a concern about when she was discharged, when she was released, that she had a safe place to go? Is that in this case? There was no specific testimony in this case. Right. Okay. So, but when she was being treated on an emergency basis, there's assaults and then there's assaults. This woman, I think, told her care providers that she'd been kicked in the head and there was concern about needing to do x-rays. X-rays were performed, they were negative. But I think before that, the physician was concerned about maybe there was going to need to be an MRI of her brain. And it seems to me the jury heard that, unless I'm misunderstanding this record, that there was concern that in this case, there was concern about the degree of force that had been inflicted. Yes. I guess I don't understand. Did the jury hear in this case that there was allegations that the defendant had been wearing boots during part of that she'd been kicked in the head with boots? Yes. They heard from the victim that he was wearing what she described at, during portions of the assault, firefighting boots. She also described him later taking off the boots. Hold on. So just to make sure we have clear communication. My question is, did the doctor know that? Is the evidence that the physician knew that that type of force may have been at issue? I don't know that that came out at trial. I think when he spoke about the amount of force, he was speaking generally about his inquiry, not specific to whether or not that force was applied to the head or a different portion of the body by the firefighting boots. Okay. So I don't mean to lead you astray from answering Judge Bennett's questions. I guess my question would be, on this record, in this case, what do you think the strongest argument is for affirming this ruling? Well, I think since the standard is abusive discretion, I think that it is, given this court's previous rulings and the district court's specific knowledge about domestic violence, it's neither illogical nor implausible that based on the reasonable inferences from this record, that those statements were made relevant to medical diagnosis. And therefore, because it's not an abusive discretion, it should be affirmed. Can you just help me a little bit and put a little more, relevant to diagnosis in this case, because the evidence showed what exactly? Because the evidence showed that this was a domestic violence situation, the relationship. That's why these doctors ask these questions. Wait a minute, is that going to be true? Is this going to be the right result in any domestic violence case? Is that really what you're arguing? No, it's not. I think those domestic violence cases where there is the same risk of psychological and emotional harm, and that's why the doctors are asking what happened in that context. That's not what he said. He said he wasn't talking about psychological and emotional trauma. He's talking about blows to her head. Correct. But the general question of how these injuries occurred and the response to that is in the larger frame about domestic violence and understanding that. Okay, my problem is just that the way you're framing this rationale right now, it seems to me that you're asking for a rule that would apply to any domestic violence case. That's problematic. I apologize if that is how I'm articulating it. But in this case, the record is not as strong as it could be because both of the doctors, the judge and the prosecutor, are working in a frame, have background and understanding about domestic violence that perhaps resulted in us not laying out as clear of the foundation. But that foundation for why this was asked and why it was answered is there. It goes to Dr. Cahill's testimony about needing that information for prognosticating, I think was the word that he used, those injuries. That's why he asked it. That's how that comes in. And that is relevant to the medical diagnosis. I'll just reassure you that the scourge of domestic violence is not limited to Montana. It is all throughout the Ninth Circuit and I'm afraid throughout our country. And we're very sensitive to it. I'm just concerned about the blanket rule you seem to be suggesting. And I'll say for the benefit maybe of defense counsel too and give you a chance to respond on that. The psychological and emotional injuries that you're suggesting, counsel, I think are going to be present in any domestic violence case. And I think in the case that we're looking at here, the window of opportunity for admitting this evidence and the relevance is a much tighter fit, it strikes me, because of the nature of injuries here and concern about the degree of force used when there are blows to her head. But if I'm misunderstanding the rule you're advocating, now's the time to tell me before we hear back from defense counsel. No, Your Honor. We believe under the abuse of discretion it should be a case-by-case analysis. And in this case, we do not believe the district court abused its discretion in applying and recognizing that these statements were medically necessary for diagnosis and therefore could be permitted under that rule. Thank you. Counsel, I'm sorry, I didn't mean counsel. Judge Bennett, Judge Kobayashi, do you have other questions for the government before we switch? No. Thank you, Judge Christy. Thank you. Great. Thank you very much for your patience with my questions, with all of our questions. We're going to hear, could you put two minutes on the clock, please? We took defense counsel significantly over time, but want to make sure he has an opportunity to respond. Go right ahead, sir. Thank you, Your Honor. And I'll be brief because the court has allowed me to go over my time and I appreciate that. But I think the court has indicated part of the defense's concern in this being a blanket rule. I would argue that emotional and psychological trauma could potentially happen not only in domestic violence cases, but in any case where there's an accusation of violence or even personal injury. But what about in this case, counsel, when there's, I think I'm right, that there was the care providers that on an emergency basis are seeing bruises to her face, to her head. I think they were aware that the allegation was she'd been kicked in the head. Is that right? Yes, I believe they were aware of that allegation. Why doesn't a physician need to know, given these facts, there's much narrower ruling on these facts. Why doesn't a physician need to know whether or not that an MRI may be necessary, an X-ray may be necessary to check for, you know, fractures and very serious injuries? Doesn't it matter if she's, the assailant is under that circumstance? Well, your honor, if it's any adult who kicks somebody in the head, I'm not a doctor, but I would presume that a doctor would have that concern about anybody, any adult who kicks somebody else in the head. The doctor didn't say that there, an amount of force that could not be used by Marlena. And in fact, I'm not even sure the doctors were aware that Marlena delivered at least some of the blows. So I don't believe that it would be relevant who the assailant is, other than maybe the size of the assailant. The identity, I don't think is relevant at all. Certainly the size of the assailant could be relevant in order to determine force and things like that. But I don't see how the identity actually gets the doctor any closer to that determination. Either of my colleagues have additional questions. Thank you. No, thank you. Thank you both. We'll take that case under advisement. Your arguments were very helpful. And we'll go on to the next case on the calendar. Thank you. That's case number 20-30102, United States versus Elk Shoulder.
judges: Christen, Kobayashi, Bennett